UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ESTHER VAZQUEZ,

**MEMORANDUM & ORDER**

**06-CV-5997 (NGG)(LB)**

Plaintiff,

-against-

SOUTHSIDE UNITED HOUSING
DEVELOPMENT FUND CORP., AND LOS
SURES MANAGEMENT COMPANY,

Defendants.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Pro se plaintiff Esther Vazquez ("Plaintiff" or "Vazquez") asserts claims of employment

discrimination on the basis of race, national origin, age, and disability under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, the Age Discrimination

in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12112-12117, against her former employer, defendants Southside United

Housing Development Fund Corporation ("SUHDFC") and Los Sures Management Company

("Los Sures") (collectively, "Defendants" or "Southside").[1]  (See Docket Entry #1, Complaint.)

Plaintiff alleges that she suffered unlawful termination, retaliation, and a lack of accommodation

for her disability as a result of the Defendants' discrimination.  (Id. ¶ 4.)  The court further

---

[1] SUHDFC is a non-profit corporation "dedicated to developing, preserving and rehabilitating new and existing low
to middle income housing for the Williamsburg, Brooklyn community." (Docket Entry #26, Defendants' Statement
of Material Facts Submitted Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Stmt.") ¶ 1.) Los Sures is a wholly-
owned subsidiary of SUHDFC that manages the daily operations of housing owned by SUHDFC. (Id. ¶ 2.)
Defendants characterize the entities as a single unit, identified as "Southside." (See id. at 1.) The court adopts
Defendants' terminology for these entities.

1

construes Plaintiff's allegations to assert a hostile work environment claim.  (See Compl. ¶ 8 &

Attachment (citing "harassment" and "threat[s]")).

Defendants have moved for summary judgment on all claims.  (See Docket Entry #25,

Defendants' Motion for Summary Judgment; Docket Entry #28, Defendants' Memorandum of

Law in Support of Motion for Summary Judgment ("Def. Mem.").)  For the reasons set forth

below, Defendants' Motion is GRANTED in its entirety.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[2]

For thirteen years, Vazquez worked for Southside as a Property Manager, overseeing

operations in its low to middle income housing properties in Williamsburg, Brooklyn.  (Def. 56.1

Stmt. ¶¶ 4, 37; Docket Entry #23, Affidavit in Opposition by Esther Vazquez, dated February 13,

2008 ("Vazquez Aff.") ¶ 2.)  Vazquez is of Puerto Rican national origin, and was 64 years old at

the time of her termination in November 2005.  (Compl. ¶ 7 & Attachment; see Vazquez Aff. ¶

7; see also Docket Entry #25 (Attachment 5), Affirmation of Jason Aschenbrand, dated

December 21, 2007 ("Aschenbrand Aff."), Ex. L, New York State Division of Human Rights

Charge of Discrimination Form dated June 6, 2006.)

Southside hired Vazquez on or about July 9, 1992.  (Def. 56.1 Stmt. ¶ 4; Docket Entry

#25 (Attachment 1) Affidavit of David Pagan, dated December 12, 2007 ("Pagan Aff.") ¶ 5.)

Throughout Vazquez's tenure, David Pagan served as the Administrator for Southside.  (Def.

---

[2] While Plaintiff opposes the Defendants' Motion for Summary Judgment, she does not dispute the majority of facts set forth in Defendants' Rule 56.1 Statement.  Pursuant to Local Rule 56.2, Defendants provided Plaintiff with notice of the consequences of failing to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and included copies of those rules.  (Docket Entry #27, Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment ("Rule 56.2 Notice").)  Plaintiff did not submit a Rule 56.1 Statement or a response to Defendants' 56.1 Statement.  Since Plaintiff is pro se, the court has nonetheless reviewed the record submitted by the parties to determine whether there are disputed issues of material fact.  See Melendez v. DeVry Corp., No. 03-CV-1029 (NGG) (LB), 2005 WL 3184277, at *2 (E.D.N.Y. Nov. 29, 2005).  The court will deem admitted only those facts in Defendants' Rule 56.1 Statement that are supported by admissible evidence and are not controverted by admissible evidence in the record.

56.1 Stmt. ¶ 5; Pagan Aff. ¶ 1.) Plaintiff's immediate supervisor was Southside's Housing Director. (Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) The position was originally held by Ana Bonano ("Bonano"), from approximately 1992-2004. (Id.) Bonano was succeeded by Rosemarie Pizarro ("Pizarro"), who served in the position for ten months in 2004. (Id.) Beginning in November 2004, Yanet Ciprian ("Ciprian") replaced Pizarro as Housing Director. (Id.; see also Docket Entry #25 (Attachments 7-8), Deposition of Esther Vazquez, dated June 29, 2007 ("Vazquez Dep.") 42.)

Plaintiff's claims center on allegations of discriminatory conduct by Ciprian from November 2004 through February 2005. Plaintiff asserts that she was "constantly harassed" by Ciprian, who pressured her "to retire so that she can replace me with someone who is younger, smarter and that could follow instructions in a faster manner." (Vazquez Aff. ¶ 3.) According to Vazquez, Ciprian called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and told Vazquez that once she left, Ciprian would "never hire another Puerto Rican" again.[3] (Id.)

From about October 22, 2004 until November 22, 2004, Plaintiff took a personal leave to care for her sister. (Def. 56.1 Stmt. ¶ 13.) Southside approved the leave. (Id.) While Plaintiff was away on leave, Ciprian took over as Housing Director. (See Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) When Plaintiff returned, Ciprian issued a memorandum admonishing her for "many discrepancies with the tenant's files such as expired leases, incomplete or missing

---

[3] Plaintiff has also submitted two notarized but unsworn statements, from Jose Velazquez and Adelaida Miranda, which support her allegations of verbal abuse against Ciprian. (See Letters from Jose Velazquez and Adelaida Miranda, attached to Vazquez Aff.) While the statements contain notary stamps, neither has a jurat – "[t]he clause written at the foot of an affidavit, stating when, where, and before whom such affidavit was sworn," Black's Law Dictionary (8th ed. 2004) – or any "sworn to" language. Nor do the statements declare that they were made under penalty of perjury as required for a declaration under 28 U.S.C. § 1746. Unsworn statements are inadmissible in evaluating a motion for summary judgment, but the court has nonetheless reviewed the statements and notes that the facts presented therein – assuming that Plaintiff could present them in an admissible form – do not affect the outcome of this decision. See White v. Sears, Roebuck & Co., No. 07-cv-4286 (NGG)(MDG), 2009 WL 1140434, at *2-3 & n.3-4 (E.D.N.Y. Apr. 27, 2009).

recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. (Aschenbrand Aff. Ex. D, Ciprian Memorandum dated November 30, 2004 ("November Memo").) Ciprian immediately removed Plaintiff from her duties managing five properties. (Id.) Ciprian informed Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building." (Id.)

Plaintiff concedes that the November Memo reflected accurate criticisms. Plaintiff testified that at the time, "[a]ll the paperwork was all over" and "[t]here were missing files" due to revisions undertaken by Ciprian's predecessor, Pizarro. (Vazquez Dep. 269-70.) Plaintiff believes that the change in her responsibilities instituted by the November Memo was based upon her age and alleged disability since Ciprian "was calling me an old lady, that I don't know nothing, that my brains are so little that I can't understand anything." (Id. at 277.) Plaintiff does not assert that this change in responsibilities was connected to her race or national origin. (Id. at 278 (Q: "What connection does [the change in responsibilities] have to your race, your being Hispanic?" A: "I don't see the connection.").) The change in Plaintiff's responsibilities did not alter her salary or title. (Id. at 279.)

At some point, Vazquez submitted a statement in support of Ana Bonano, one of Ciprian's predecessors, in a proceeding ostensibly against Southside. (See id. at 67.) Around December 2004, Vazquez claims that Ciprian called her a "traitor" because she had supported Bonano in that proceeding. (Id.) Vazquez stated that Ciprian said "Mr. Pagan should lay you off" because she was a "traitor." (Id.) At her deposition, Vazquez could not identify any adverse actions taken in retaliation against her other than the offensive comments by Ciprian. (See id. at 69.)

Sometime in December 2004, Vazquez asserts that Ciprian also told her: "You fucking old lady, I'm going to do the impossible for you to get the hell out of here." (Id. at 108.) Vazquez asserts that Ciprian harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people." (Id. at 53.) Vazquez alleges generally that Ciprian "called [her] a whole lot of name[s]," including a "stupid Puerto Rican" and "a fucking spick." (Id. at 72.) Vazquez claims that Ciprian "said she would not hire any other Puerto Rican because they're all stupid." (Id. at 107.)

On January 25, 2005, Ciprian issued another memorandum to Vazquez, reiterating her new responsibilities and reprimanding Vazquez for excessive personal telephone calls. (Def. 56.1 Stmt. ¶ 19; Aschenbrand Aff. Ex. E, Ciprian Memorandum dated January 25, 2005 ("January Memo").) The January Memo stated, "Be aware that I have noticed that you are not complying with your duties," and threatened in bold, "Let this memo serve you as a warning that failure to comply with your job duties, could result in disciplinary action against you." (Aschenbrand Aff. Ex. E.) Around this time, Vazquez asserts that Ciprian called her "a fucking Puerto Rican spick." (Vazquez Dep. 65.)

On February 18, 2005, Ciprian issued a "final warning" to Vazquez regarding her job performance. (Def. 56.1 Stmt. ¶ 21; Aschenbrand Aff. Ex. F, Ciprian Memorandum dated February 18, 2005 ("February Memo"); Vazquez Dep. 288.) The February Memo admonished Vazquez for "instigat[ing] matters" amongst the tenants, failing to log all incoming calls, and spending 30 minutes that day on a personal telephone call. (Aschenbrand Aff. Ex. F.) In closing, the February Memo declared: "Let this notice serve as a final warning that this type of behavior is totally unprofessional and will not be tolerated, if satisfactory improvement is not

shown immediately you may be subjected to further disciplinary action that may lead to suspension or termination." (Id.)

The same day that Plaintiff received this final warning, Plaintiff began a leave of absence from Southside. (Def. 56.1 Stmt. ¶ 23; Pagan Aff. ¶ 10; Vazquez Dep. 294-95.) Plaintiff asserts that Ciprian's "daily abuse took its toll on [her] health" and that she had a "nervous breakdown" after an incident in which Ciprian grabbed papers from her, threw them, and repeatedly yelled at her, "You are so stupid, fucking old lady." (Vazquez Aff. ¶ 4; Vazquez Dep. 61-62.) According to Plaintiff, she left work on February 18, 2005 and sought "the care of a medical doctor who agreed that my condition was due to the situation [she] had to endure at [her] job." (Vazquez Aff. ¶ 3; Vazquez Dep. 294-95.) On March 14, 2005, Plaintiff's physician, Dr. Victor Basbus noted that Plaintiff suffered from recurrent and severe depression, anxiety, insomnia, and nervousness, and declared that she was "unable to work." (Aschenbrand Aff. Ex. G, Notice and Proof of Claim for Disability Benefits Form, Def. 56.1 Stmt. ¶ 25; Vazquez Dep. 295-96.) Plaintiff remained on leave for more than eight months.

Southside repeatedly requested further information from Plaintiff and Dr. Basbus regarding Plaintiff's ability to return to work, but received little information. (Pagan Aff. ¶ 10.) On March 30, 2005, Pagan wrote to Dr. Basbus seeking clarification as to when Plaintiff would be able to return to her job at Southside. (Def. 56.1 Stmt. ¶ 26; Aschenbrand Aff. Ex. H, Letter dated March 30, 2005.) On April 29, 2005, Dr. Basbus advised in response that Plaintiff was "under psychiatric treatment" and was "unable to work at this time," citing her depression, insomnia, and "dizzy spells." (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Vazquez Dep. 305-6; see Def. 56.1 Stmt. ¶ 27.)

In June 2005, Plaintiff visited Southside's offices and met with Aminta Hernandez, Southside's personnel officer at the time. (Def. 56.1 Stmt. ¶ 28; Vazquez Dep. 65, 317-18.) Hernandez provided Plaintiff with a letter requesting that Plaintiff authorize Dr. Basbus to notify Southside of Plaintiff's condition and the date she could be expected to return to her regular duties. (Def. 56.1 Stmt ¶ 28; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) Plaintiff responded that Dr. Basbus had "put her on leave and [that she could not] come back until he gave [her] the clearance." (Def. 56.1 Stmt. ¶ 29; Vazquez Dep. 64.) Dr. Basbus never provided Plaintiff clearance to return to work, and on October 26, 2005, he again wrote in a medical report that Plaintiff suffered from depression, insomnia, and dizzy spells, along with arthritis, impaired vision, and lower back pain. (Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; Def. 56.1 Stmt. ¶¶ 31-32; Vazquez Dep. 338-40.) Dr. Basbus concluded on the form that Plaintiff was "unable to work at all." (Aschenbrand Aff. Ex. K.)

By early November 2005, Southside still did not know if and when Plaintiff would be able to return to work. (Def. 56.1 Stmt. ¶ 35; Pagan Aff. ¶ 11.) Southside viewed Plaintiff's absence as indefinite and decided that it could no longer hold the position open for her. (Def. 56.1 Stmt. ¶ 36; Pagan Aff. ¶ 11.) On November 3, 2005, Pagan terminated Vazquez's employment and sent her a letter informing her of the decision. (Def. 56.1 Stmt. ¶ 37; see Pagan Aff. ¶ 11, Ex. C, Letter from David Pagan to Esther Vazquez, dated November 3, 2005 ("Nov. 3 Letter").) Pagan's letter informed Vazquez that since she had been "out on disability since February 24, 2005," a span of more than eight months, Southside found that it necessary to officially terminate Vazquez and declare her position vacant. (See Pagan Aff. ¶ 11 & Ex. C.) Pagan attests that he acted as the sole decisionmaker who terminated Vazquez, and that her race,

national origin, age, and purported disability did not factor into his decision. (Pagan Aff. ¶ 12.) Ciprian played no role in the decision. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.)

Defendants concede that Ciprian "adopted a demanding management style, which occasionally led to personality clashes with certain of her subordinates," including Plaintiff. (Def. 56.1 Stmt. ¶ 8.) Defendants claim that Ciprian "inherited a department in disarray" and needed to "remedy the dire situation in the department." (Id. ¶¶ 7-8.)

Southside Administrator Pagan asserts that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her." (Pagan Aff. ¶ 9.) According to Pagan, "[t]he only issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian." (Id.; see also Def. 56.1 Stmt. ¶¶ 39-40.) Vazquez claims that when she approached Pagan with her complaints, he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do." (Vazquez Dep. 118.) Southside had a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy") that was created and distributed to "All Staff" as of August 18, 2004. (Pagan Aff. Ex. B.) The policy prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage, . . . , age, disability or handicap . . . or any other legally protected status" and established a reporting mechanism for violations. (Id.) The reporting mechanism allowed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law, without regard to any "chain of command." (Id.) The policy advised employees to speak to "whomever you feel most comfortable with among your supervisor or the Administrator." (Id.)

From July 1998 until her termination in 2005, Vazquez was a member of Local 1102, RWDSU UFCW ("Local 1102"), and her terms and conditions of employment were governed by the collective bargaining agreement ("CBA") in effect between Local 1102 and Southside. (Def. 56.1 Stmt. ¶ 9; see also Pagan Aff. Ex. A (attaching copies of relevant CBAs).) The CBA in effect between Plaintiff's union, Local 1102, and Southside set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (discrimination policy), Article 5 (grievance procedure).) At some point prior to leaving Southside in February 2005, Vazquez spoke to A.J. Salgado, a Local 1102 representative, about her problems with Ciprian. (Vazquez Dep. 115-18.) Vazquez never filed a grievance regarding her treatment by Ciprian. (Id. at 274.)

Plaintiff asserts that as of February 2008, she was willing and able to work, but had not found gainful employment. (Vazquez Aff. ¶ 5.) She attests that she is "close to destitute and feel[s] that [she] could have been, until this day, a productive member of South Side United, a job that [she] loved with all [her] heart and gave [her] all to." (Id. ¶ 5.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The substantive law governing the case dictates which facts are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-252. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "Therefore, summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted).

In ruling on a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted). Further, "in pro se cases, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers,' and should read a pro se party's 'supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest.'" Vanhorne v. New York City Transit Auth., 273 F. Supp. 2d 209, 213 (E.D.N.Y. 2003) (internal citations omitted); accord Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006).

## III.   DISCUSSION

### A.   Race, National Origin, and Age Discrimination Claims

The ADEA and Title VII set forth parallel requirements for a plaintiff to establish a prima face case of discrimination. See Nieves v. Angelo, Gordon, & Co., No. 07-cv-2330, 2009 WL 1910970, at *2 (2d. Cir. July 6, 2009) (recognizing generally that "[t]he same standards and burdens apply to claims under both Title VII and the ADEA."). Under both statutes, a plaintiff must demonstrate that: 1) she belonged to a class protected by the statute; 2) she was qualified

10

for the position; 3) she was subjected to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (citing Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (enumerating elements of ADEA prima facie case) and Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002) (setting forth elements of Title VII prima facie case)); see also Cretella v. Liriano, --- F. Supp. 2d ----, No. 08-cv-1566(LTS)(THK), 2009 WL 1730993, at *11 (S.D.N.Y. June 17, 2009) (applying the same four requirements to Title VII and ADEA claims). Claims under both statutes are analyzed under the burden-shifting framework of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). If a plaintiff establishes a prima facie case under either statute, the burden shifts to the defendant to offer a legitimate, non-discriminatory rationale for its actions. See Terry, 336 F.3d at 138; McDonnell Douglas Corp., 411 U.S. at 802 (setting forth burden-shifting analysis under Title VII); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (extending McDonnell Douglas burden-shifting analysis to the ADEA). Should a defendant offer a neutral explanation for its actions, the plaintiff may defeat summary judgment by offering evidence sufficient to show that the proffered neutral explanation was a pretext for discrimination. See Terry, 336 F.3d at 138. The plaintiff bears the ultimate burden of persuasion to demonstrate that the adverse employment action resulted from discrimination. See Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 123 (2d Cir. 2004).

Vazquez's age, race, and national origin discrimination claims are based on two alleged adverse employment actions: the change in her job responsibilities that occurred in November 2004, and the termination of her employment in November 2005. It is undisputed that Vazquez is a member of the classes protected by the statutes, and Defendants do not argue that she lacked

any of the qualifications for her position. Nonetheless, Vazquez fails to demonstrate that a genuine issue of material fact exists that could support her claims of discrimination based upon age, race, or national origin with respect to either adverse action. As a result, the court GRANTS summary judgment to Defendants on Vazquez's claims of employment discrimination under the ADEA and Title VII.

### 1. Change in Job Responsibilities

An "adverse employment action" is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). A change in job responsibilities can constitute an adverse action where accompanied by "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (quoting Crady, 993 F.2d at 136).

Ciprian's November Memo presented the change in Plaintiff's job responsibilities and documented the reasons for the change. (See Aschenbrand Aff. Ex. D.) According to the November Memo, Ciprian removed Plaintiff from her duties managing five properties, and informed Plaintiff that she would "not be handling any Lease renewals, re-certifications, community room rentals, move-outs, etc." (Id.) Ciprian notified Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building." (Id.) These were duties that Vazquez already handled as a Property Manager; the November Memo had the effect of limiting Vazquez's prior responsibilities. (See Vazquez Dep. 272.) Ciprian made clear that Vazquez's responsibilities had changed because her performance was perceived to be unsatisfactory. (See Aschenbrand Aff. Ex. D.) Plaintiff concedes that she did not suffer any

12

changes in her compensation, her job title, or her reporting relationship as a result of the November 2004 change in job responsibilities. (See Vazquez Dep. 125, 279.)

Viewing the facts in the light most favorable to Vazquez, a reasonable finder of fact could conclude that November 2004 change in responsibilities constituted an adverse action because the November Memo may have "significantly diminished [her] material responsibilities" as a Property Manager at Southside. See Galabya, 202 F.3d at 640. Further, the record suggests that Ciprian made the decision to change Vazquez's responsibilities. Vazquez testified at her deposition that Ciprian made numerous racist and ageist remarks to her during the course of her tenure. (See, e.g., Vazquez Dep. 53, 72, 107-08.) Vazquez's testimony presents sufficient evidence of Ciprian's alleged animus for a finder of fact to conclude that Vazquez was subject to adverse action under circumstances giving rise to an inference of discrimination. Back, 365 F.3d at 124 (evidence of discriminatory comments can constitute "direct evidence" adequate to make out a prima facie case, even where uncorroborated).

Southside argues that even if Plaintiff has presented a prima facie case, Southside has articulated legitimate, non-discriminatory reasons for the change in Plaintiff's responsibilities. In the November Memo, Ciprian stated that she had found "many discrepancies with the tenant's files such as expired leases, incomplete or missing recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. Plaintiff concedes that "[a]ll the paperwork was all over" and "[t]here were missing files." (Vazquez Dep. 269-270.) Plaintiff stated that this disorganization was due to revisions undertaken by Ciprian's predecessor, Pizarro. (Id. at 269.) Regardless, Southside argues that it was "entitled to make a business decision to change plaintiff's job responsibilities to remedy these problems." (Def. Mem. 11.)

13

Since Southside has proffered a neutral justification for the change in Plaintiff's responsibilities, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotations omitted). At the summary judgment stage, plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." Gallo v. Prudential Residential Serv., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original). Because the standards for this showing diverge under the two statutes at issue, the court considers the evidence supporting Plaintiff's Title VII and ADEA claims separately at this stage.

     i.  Title VII

To the extent Plaintiff asserts that the change in her job responsibilities violated Title VII, Plaintiff has failed to offer evidence that could refute Southside's proffered neutral justification. At her deposition, Plaintiff appeared to retract her allegations that the November 2004 change in her responsibilities was based upon her race and national origin. (See Vazquez Dep. 278 (stating "I don't see the connection" between the change in her responsibilities and her race or national origin).) Plaintiff has conceded that the criticisms contained in the November Memo were accurate. (Id. at 269-270.) In light of Plaintiff's own concessions, the court finds itself constrained to conclude that there is no genuine dispute of fact regarding a Title VII discrimination claim for the change in Plaintiff's job responsibilities.

The court further notes that Plaintiff has not put forward any evidence to demonstrate that similarly situated individuals were treated differently, or any other indicia suggesting this

particular employment action was motivated by discrimination. The only available evidence raising Title VII concerns relates to the offensive remarks allegedly made by Ciprian, which Plaintiff appears to allege began only after the November Memo and her change in responsibilities. (Compl. ¶ 5 (citing approximate dates beginning in December of 2004).)

Summary judgment is GRANTED to Defendants insofar as Plaintiff relies upon Title VII liability for this claim.

### ii. ADEA

As in the Title VII context, Plaintiff must put forth "competent evidence" that Defendants' proffered justification was a pretext for discrimination to survive summary judgment on her ADEA claim. Patterson, 375 F.3d at 221. In addition, the Supreme Court recently held that plaintiffs bear a greater burden of persuasion at this stage on ADEA claims, in contrast to Title VII claims.[4] To establish liability under the ADEA, a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351 (2009).

Plaintiff's ADEA claim for the change in her job responsibilities fails to withstand summary judgment. Plaintiff concedes that the criticisms contained in the November Memo reflected legitimate concerns about the condition of the office files at the time. (Vazquez Dep. 269-270.) Plaintiff testified at her deposition that the change in job responsibilities was

---

[4] In the Title VII context, the law recognizes that a plaintiff can establish a "mixed-motives" case by "convinc[ing] the trier of fact that an impermissible criterion in fact entered into the employment decision." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir. 1992). To succeed in a mixed-motive showing, the plaintiff must "prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Id. (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989)). If the plaintiff demonstrates that a discriminatory motive exists, even if a legitimate motive is also present, the burden of proof passes to the defendant to establish that it would have made the same decision without considering the illegitimate factor. See id. Since Plaintiff has conceded that she lacks evidence supporting a claim of race or national origin discrimination, the court does not reach this issue with respect to her claim for change in job responsibilities.

connected to her age because Ciprian "probably thought that I couldn't handle my position as it was" and that the change made it seem that Plaintiff "was the worse within her co-workers." (Id. at 276.) When asked whether she could offer any facts linking the decision to change her responsibilities to her age, Plaintiff testified simply: "That's my belief." (Id.) However, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" in a discrimination action. Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008); Martin v. MTA Bridges & Tunnels, 610 F. Supp. 2d 238, 251 (S.D.N.Y. 2009) (plaintiff's "belief" that action was motivated by discrimination not sufficient to raise a genuine issue of fact).

The only other evidence in the record related to Plaintiff's age discrimination claims consists of offensive remarks allegedly made by Ciprian; the timing of these remarks appears to post-date the November Memo. The court finds that this evidence is insufficient to raise a genuine issue of fact as to whether Southside's stated reasons for the change in Plaintiff's responsibilities were merely a pretext concealing a motive of age discrimination. Given Plaintiff's concessions that the November Memo reflected accurate information and valid concerns, the court finds that a reasonable finder of fact could not conclude that "age was the 'but-for' cause of the challenged employer decision." Gross, 129 S. Ct. at 2351. The court GRANTS summary judgment to Defendants on Plaintiff's ADEA claim for the change in her job responsibilities.

### 2. Termination

Plaintiff's claims regarding her ultimate termination in November 2005 fail to set forth a prima face case of race, national origin, or age discrimination. Plaintiff has failed to raise an issue of fact that could suggest that her termination occurred under circumstances giving rise to an inference of discrimination. Southside terminated Plaintiff because it could no longer

maintain an open position for her while she took an indefinite leave. The undisputed evidence demonstrates that Southside went to great lengths to hold Plaintiff's position open for her during an eight-month absence. Southside made multiple attempts to ascertain whether Plaintiff would be willing and able to reclaim her job at some point; those inquiries went unanswered. (See, e.g., Aschenbrand Aff. Ex. H, Letter from David Pagan dated March 30, 2005; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) There is no evidence that Ciprian, the sole perpetrator of the alleged discrimination, had any part in the decision to terminate Plaintiff. (See Pagan Aff. ¶ 12.) Plaintiff's testimony shows that she endured unprofessional and demeaning treatment by Ciprian, but nothing in the record suggests that these events – occurring from November 2004 until February 2005 – infected the decision by Pagan to terminate Plaintiff nearly a year later in November 2005. The facts surrounding the circumstances of Plaintiff's termination are undisputed, and they do not raise an inference of discrimination.

The same undisputed facts show that, even if Plaintiff could set forth a prima facie case, Southside has offered a neutral justification for Plaintiff's termination. At the time of her termination, Plaintiff had been absent on leave for over eight months, with no indication from her or her physician as to when, if ever, she would be able to return to work. (See Pagan Aff. ¶¶ 10-11; Vazquez Dep. 160-62). Southside was not required to hold Vazquez's position open for her under these circumstances. See infra Section III.B (citing cases and analyzing issue of Plaintiff's absence). Plaintiff has not put forth any competent evidence to rebut this neutral justification. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's claims that her termination violated the ADEA and Title VII.

B. <u>Disability Claims</u>

Plaintiff also asserts that her termination constituted disability discrimination in violation of the ADA. (Compl. ¶ 4 (citing termination and failure to accommodate disability).) To establish a prima facie case of disability discrimination, a plaintiff must show that: 1) her employer is subject to the ADA; 2) she was disabled within the meaning of the ADA; 3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and 4) she suffered adverse employment action because of her disability. <u>See</u> <u>Sista v. CDC North America, Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006); <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 134 (2d Cir. 2008). Once a plaintiff establishes a prima facie case, the court analyzes her claim under the same <u>McDonnell Douglas</u> burden-shifting framework applicable to Title VII and ADEA claims. <u>See</u> <u>Sista</u>, 445 F.3d at 169; <u>see also</u> <u>supra</u> Section III.A.

Defendants appear to concede that they are subject to the ADA. Although the evidence of Plaintiff's condition is rather general and conclusory, the court assumes <u>arguendo</u> that Plaintiff could put forth facts demonstrating that she was "disabled" within the meaning of the ADA on account of her depression and related disorders. <u>See, e.g.</u>, <u>Honeck v. Nicolock Paving Stones of New England, LLC</u>, 247 Fed. Appx. 306, 308 (2d Cir. Sept. 19, 2007) (summary order) (depression can constitute disability within meaning of the ADA where it "substantially limits one or more of the major life activities"); <u>see also</u> 29 C.F.R. § 1630.2(g) (defining "disability" under the ADA). It is clear from the undisputed evidence that Southside terminated Plaintiff because of her failure to attend work, and to represent when, if ever, she could resume her job functions. Plaintiff attributes these deficiencies to her alleged disability.

The court finds that Plaintiff has failed to set forth a prima facie case of disability discrimination because she was not qualified to perform the essential functions of her job, with

or without reasonable accommodation. Attendance at work was an essential function of Plaintiff's job. See Ramirez v. New York City Bd. of Educ., 481 F. Supp. 2d 209, 221 (E.D.N.Y. 2007) (citing myriad cases and finding that attendance is typically an essential function of employment); Bobrowsky v. New York City Bd. of Educ., No. 97-cv-874(FB), 1999 WL 737919, at *4 (E.D.N.Y. Sept. 16, 1999) (holding that the ADA does not require an employer to retain a person who fails to attend work because "attendance is an essential function of . . . employment"), aff'd, 213 F.3d 625 (2d Cir. 2000); Mescall v. Marra, 49 F. Supp. 2d 365, 374 (S.D.N.Y. 1999) (to be qualified for a job, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis.") (internal quotations omitted). Plaintiff and her physician consistently represented that she was "unable to work," and at the time of her termination, Plaintiff had not appeared for work for over eight months. (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; see Pagan Aff. ¶ 11 & Ex. C.)

The ADA does not require an employer to maintain an employee's position while an employee unilaterally takes an indefinite leave of absence. Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover. . . ."); Wisenski v. Nassau Health Care Corp., 296 F. Supp. 2d 367, 374 (E.D.N.Y. 2003) (noting that "the ADA does not require an employer to grant an employee an indefinite leave of absence" and citing supporting authority from the Third, Fourth, Fifth, Seventh, and Tenth Circuits). The undisputed evidence demonstrates that Plaintiff never sought permission for a specified leave of absence, and that over the course of eight months,

Southside repeatedly requested clarification as to when Plaintiff could resume her work. (See, e.g., Letter from David Pagan dated March 30, 2005 (Aschenbrand Aff. Ex. H); Letter from Aminta Hernandez dated June 3, 2005 (Aschenbrand Aff. Ex. J).) Plaintiff and her physician, Dr. Basbus, neglected to respond to this question. On each occasion, Dr. Basbus simply responded that Plaintiff was "unable to work." (Report by Dr. Basbus dated April 29, 2005 (Aschenbrand Aff. Ex. I); Report by Dr. Basbus, dated October 26, 2005 (Aschenbrand Aff. Ex. K).) Southside was not obligated to accommodate this indefinite leave. Cf. Rambacher v. Bemus Point Cent. Sch. Dist., 307 Fed. Appx. 541, 544 (2d Cir. Jan. 22, 2009) (summary order) (where plaintiff suffering from depression took approved, limited period of medical leave and doctor opined that she would be able to return to duty "in a few months' time," question of plaintiff's qualification for job survived summary judgment).

Further, Plaintiff never requested an accommodation for her alleged disability, but instead simply left work on an indefinite leave. As Plaintiff explained: "I just went to the doctor, and the doctor sent the letter to the office stating that I cannot go to work." (Vazquez Dep. 64.) Since no accommodation was requested, Plaintiff cannot claim that she was denied reasonable accommodations for her disability. See Rivera v. Apple Indus. Corp., 148 F. Supp. 2d 202, 215 (E.D.N.Y. 2001) (rejecting accommodation claim as a matter of law where no request was ever posed to employer); Mazza v. Bratton, 108 F. Supp. 2d 167, 176 (E.D.N.Y. 2000) (holding that a claim for disability discrimination based on a failure to accommodate a plaintiff "is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer.").

The undisputed facts demonstrate that Plaintiff has failed to set forth a prima facie case of discrimination under the ADA. The court additionally notes that even if Plaintiff had

demonstrated a prima facie case, Defendants have met their burden to show that Plaintiff was terminated due to legitimate, non-discriminatory reasons, and Plaintiff has failed to rebut those neutral justifications. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's ADA claims.

## C. Retaliation

Plaintiff further claims that Ciprian retaliated against her because she assisted a former Southside employee, Ana Bonano, in a proceeding against Southside. Although the facts are unclear from the record, Vazquez alleges that in December 2004, Ciprian discovered that Vazquez submitted a written statement in support of Bonano's case and called her a "traitor." (See Vazquez Dep. 67.) According to Vazquez, Ciprian said "Mr. Pagan should lay you off, you are not supposed to be working here; you are a traitor." (Id.) Vazquez has not identified any adverse actions taken in retaliation against her other than these offensive comments by Ciprian. (See Vazquez Dep. 68-69.) Specifically, Plaintiff does not assert that the change in her responsibilities or her termination were adverse actions taken in retaliation for her support of Bonano.

To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that "(1) she was engaged in protected activity; (2) the employer was aware of the employee's participation in the protected activity; (3) the employer took action that a reasonable employee would have found materially adverse; and (4) a causal connection existed between the employee's protected activity and the adverse action taken by the employer." Guarino v. St. John Fisher Coll., 321 Fed. Appx. 55, 58 (2d Cir. Apr. 8, 2009) (citing Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. 2006)). The McDonnell Douglas burden-shifting analysis governing employment discrimination claims also applies to retaliation

claims. See Terry, 336 F.3d at 140-41 (citing cases and noting application to Title VII and ADEA). Viewing the facts in the light most favorable to Plaintiff, the court accepts that Plaintiff's testimony is sufficient to show that she engaged in a protected activity by serving as a witness for Bonano.

Plaintiff's retaliation claim fails to set forth a prima facie case because a reasonable employee would not have viewed Ciprian's comments, while unprofessional and offensive, as materially adverse actions. In Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53 (2006), the Supreme Court held that in the context of retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[5] Id. at 68 (internal citations omitted). While the Court found that the prohibitions on retaliation expanded beyond "discriminatory actions that affect the terms and conditions of employment," it also noted that an individual is protected "not from all retaliation, but from retaliation that produces an injury or harm." Id. at 64, 68. Courts interpreting Burlington Northern have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions. See Harris v. South Huntington Sch. Dist., No. 06-cv-3879 (DGT), 2009 WL 875538, at *19 (E.D.N.Y. Mar. 30, 2009) (finding no material adverse action where supervisor allegedly asked plaintiff to resign after he complained about other employees); Pugni v. Reader's Digest Ass'n, Inc., No. 05-cv-8026 (CM), 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) (threats that

---

[5] Burlington Northern involved the statutory interpretation of Title VII's retaliation provisions, set forth in 42 U.S.C. § 2000e-3(a). Courts have nonetheless applied its holding to retaliation claims more generally. See, e.g., Sekyere v. City of New York, No. 05-cv-7192(BSJ)(DCF), 2009 WL 773311, at *6 (S.D.N.Y. Mar. 18, 2009) (discussing Burlington Northern in the context of both Title VII and ADEA retaliation claims); accord Gomez-Perez v. Potter, 128 S. Ct. 1931, 1945 (2008) (Roberts, J. dissenting) (finding the anti-retaliation provisions of Title VII "materially indistinguishable" from their counterparts in the ADEA). Given the broad nature of Plaintiff's retaliation claim, the court analyzes it under the Burlington Northern standard.

plaintiff's days at company "were numbered" were not viewed as materially adverse action where threat was never executed).

The Burlington Northern inquiry is highly fact-specific. As the Court explained, "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances." 548 U.S. at 69. The heart of the inquiry is whether, under the particular circumstances, the challenged actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. Vazquez has presented no evidence that Ciprian's comments chilled her support of Bonano, or caused her to actually fear reprisal. The supervisor with ultimate authority to terminate Vazquez, David Pagan, was not implicated in these threats. The court finds that while these comments fit within a pattern of highly inappropriate behavior by Ciprian, there is insufficient evidence for a reasonable finder of fact to conclude that the comments would dissuade a reasonable worker from making or supporting a charge of discrimination. See Harris, 2009 WL 875538, at *19; Pugni, 2007 WL 1087183, at *23. In fact, there is no evidence that Ciprian's comments served to dissuade Vazquez, as she ultimately filed her own complaint with the Equal Employment Opportunity Commission and eventually pursued this action. See, e.g., McWhite v. New York City Hous. Auth., No. 05-cv-0991(NG)(LB), 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (noting that plaintiff's pursuit of EEOC claim despite alleged retaliatory actions further indicated that plaintiff did not suffer materially adverse action).

As stated above, Plaintiff does not assert that the change in her responsibilities or her termination were retaliatory. The court notes that the record does not suggest any causal connection between the alleged protected activity undertaken by Vazquez and these adverse employment actions taken by Southside. The change in Vazquez's responsibilities was made

prior to the allegedly retaliatory remarks by Ciprian, and there is no evidence that Ciprian knew of Plaintiff's alleged protected activity at that time. (See Aschenbrand Aff. Ex. D, November Memo.) Ciprian played no part in the decision to terminate Plaintiff, a decision that was made eleven months after Ciprian's alleged threats. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.) There is no evidence that Pagan, the decision-maker, even had knowledge of Plaintiff's alleged protected activity at the time of her termination.

Furthermore, even if Plaintiff could present a prima facie case of retaliation, Defendants have advanced legitimate, non-discriminatory reasons for each action, and Plaintiff has failed to rebut those neutral justifications. See supra Sections III.A. & III.B.

> D. Hostile Work Environment

The court construes Plaintiff's allegations of "harassment" and "threat[s]" by Ciprian as a hostile work environment claim. See, e.g., McWhite, 2008 WL 1699446, at *16 n.7 (interpreting pro se complaint to raise hostile work environment claim in the context of Title VII and ADEA action); Triestman, 470 F.3d at 474 ("the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest.") (internal quotations omitted). To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must demonstrate evidence: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (internal quotation marks and brackets omitted); see also Martinez v. City of New York, No. 08-cv-1624, 2009 WL 2171398, at *1 (2d Cir. July 22, 2009) (summary order) (a plaintiff must show that his or her "workplace was permeated with discriminatory intimidation, ridicule,

and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (citing Hayut v. State Univ. of New York, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotation marks omitted))).

## 1. Vazquez's Work Environment

Viewing the facts in a light most favorable to Plaintiff, it is clear that Ciprian treated Plaintiff in a derogatory manner entirely inappropriate for the workplace. The court does not condone Ciprian's actions. However, Title VII and the anti-discrimination laws set forth here do not impose "a general civility code for the American workplace." Burlington Northern, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). "[I]solated or episodic incidents involving racial slurs or other discriminatory conduct . . . . do[] not rise to the level of severity or pervasiveness needed to support a hostile work environment claim." Smith v. New Venture Gear, Inc., 319 Fed. Appx. 52, 56 (2d Cir. Apr. 26, 2009) (summary order). A "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." Id. (internal quotation marks and citations omitted). Courts consider a host of factors to make this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the employee's work; and (5) what psychological harm, if any, resulted." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir.

1999) (internal quotations omitted), <u>abrogated on other grounds by</u> <u>Burlington Northern</u>, 548 U.S. at 67-68; <u>see also</u> <u>Heba v. New York State Div. of Parole</u>, 537 F. Supp. 2d 457, 467 (E.D.N.Y. 2007) (applying these factors).

Vazquez's testimony demonstrates that Ciprian's conduct was reprehensible. According to Vazquez, Ciprian harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people." (Vazquez Dep. 53.) Sometime in December 2004, Vazquez asserts that Ciprian also told her: "You fucking old lady, I'm going to do the impossible for you to get the hell out of here." (<u>Id</u>. at 108.) Vazquez alleges generally that Ciprian's abuse turned racist, and that Ciprian "called [her] a whole lot of name[s]," including a "stupid Puerto Rican," "a fucking spick," and "a fucking Puerto Rican spick." (<u>Id</u>. at 65, 72.) According to Vazquez, Ciprian called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and "said she would not hire any other Puerto Rican because they're all stupid." (Vazquez Aff. ¶3; Vazquez Dep. 107.) Defendants do not put forward any evidence to controvert this testimony. Further, it is undisputed that Ciprian was Vazquez's supervisor during the time at issue. <u>See</u> <u>Mack</u>, 326 F.3d at 123 ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability." (internal quotation marks and citations omitted)).

The statements of Jose Velazquez and Adelaida Miranda, ruled inadmissible by the court because they are unsworn, <u>see</u> <u>supra</u> n.3, generally corroborate the existence of serious conflict between Vazquez and Ciprian. The court finds that the exclusion of the statements does not affect the court's decision here, because the court already views the facts in the light most

favorable to Vazquez on summary judgment, and the statements offer little information beyond Vazquez's own testimony.[6]

Dr. Basbus was deposed to assess the alleged psychological harm suffered by Plaintiff on account of these events at Southside, but the minimal excerpts of his testimony provided to the court offer no insight into this question. (See Docket Entry #25 (Attachment 9), Deposition of Dr. Basbus, dated July 21, 2007.) His written documentation of Vazquez's condition was similarly conclusory and offered no opinion as to the cause of her depression, anxiety, and other symptoms. (Aschenbrand Aff. Exs. G, I, & K.)

Generally, the hostile work environment claims that the Second Circuit has allowed to proceed beyond summary judgment have involved "more severe, sustained, and specific instances of alleged discrimination" than those present here. Kemp v. A & J Produce Corp., 164 Fed. Appx. 12, 14 (2d Cir. Dec. 7, 2005) (reviewing cases where hostile work environment claims withstood summary judgment). The egregious facts underlying these precedents set a high bar for hostile work environment claims. See, e.g., Kemp v. A & J Produce Corp., No. 00-cv-06050 (ERK), 2005 WL 5421296, at *19 (E.D.N.Y. June 7, 2005), aff'd, 164 Fed. App. 12 (2d Cir.) (claim dismissed on summary judgment where a Caucasian supervisor "allegedly made numerous racial slurs such as calling African-Americans 'monkeys' or 'Kunta.'").

In this case, however, Vazquez has testified that she suffered daily harassment involving the use of racial epithets by her supervisor, demonstrated that her supervisor altered her job responsibilities in a manner that could be considered a demotion, and provided documentary

---

[6] For example, the inadmissible statement provided by Adelaida Miranda asserts that Ms. Miranda saw Ciprian's "verbal abuse" of Vazquez, and specifically witnessed Ciprian insult Vazquez by saying "this fucking old lady thinks she is the boss of the unit." (Docket Entry #23, Statement of Adelaida Miranda, dated February 8, 2008.) Jose Velazquez's statement refers generally to "insults" by Ciprian such as being called "old," and his own feelings of intimidation by Ciprian. (Docket Entry #23, Statement of Jose Velazquez, undated.) These statements support the view that Ciprian acted rudely and inappropriately towards Vazquez, facts already accepted by the court for the purposes of this motion. The statements, however, do little to demonstrate that Ciprian specifically displayed ageist or racist animus as opposed to personal dislike.

evidence that her supervisor explicitly threatened her job in writing on at least three occasions. Vazquez has testified that after 13 years of employment at Southside, these events traumatized her so deeply that she had a "nervous breakdown" and could no longer work. (Vazquez Aff. ¶ 4.) All of these incidents took place in the condensed time frame of three months. In light of Plaintiff's pro se status and the court's obligation to view the facts in the light most favorable to the Plaintiff on summary judgment, the court finds that a genuine issue of fact remains as to whether Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment." Mack, 326 F.3d at 122.

The cases cited by Defendants are distinguishable. In Chandler v. American Eagle Airlines, 251 F. Supp. 2d 1173 (E.D.N.Y. 2003), the plaintiff claimed that his supervisor and co-workers frequently made age-related comments, such as calling him "too slow" and a "fucking old man," made references to his erectile dysfunction and urination capabilities, and threatened him verbally and physically. Id. at 1184-85. In dismissing the claim, Judge Gershon noted that Chandler had testified that many of the comments had been "made in jest and were not discriminatory in nature" and that he had reported "no continuing fear . . . nor an inability to perform his job duties" as a result of the allegedly hostile work environment he experienced over the course of four years. Id. at 1185-86. In the second case relied upon by Defendants, Citroner v. Progressive Casualty Insurance Company, 208 F. Supp. 2d 328 (E.D.N.Y. 2002), the plaintiff alleged that his supervisor had "mocked the Spanish language; left a Speedy Gonzalez doll on plaintiff's desk and referred to plaintiff as Speedy Gonzalez; told plaintiff either once or several times (plaintiff's testimony is inconsistent) to act more white and loose his cocky Spanish attitude; and passed gas one time near his face and made a comment about Hispanics and beans."

Id. at 340. Despite these serious allegations, Judge Gershon found that a reasonable jury could not find for Citroner on his hostile work environment claim because, by Citroner's own account, this alleged harassment had occurred for just one week before he was suspended for other reasons. Id. at 340-41. Citroner was ultimately terminated on unrelated grounds, because he had sexually harassed a coworker. Id. at 341. The court finds that, by contrast, the evidence presented by Vazquez is sufficient to raise a question of fact as to the severity and pervasiveness of the hostile work environment she endured.

### 2. Southside's Liability

Even if Plaintiff can demonstrate that she was subjected to hostile work environment, she must demonstrate that these conditions can be specifically imputed to Southside. As the Second Circuit has explained:

> Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee; if it did, the employer will, ipso facto, be vicariously liable. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004) (internal quotation marks and citations omitted) (interpreting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)). Southside asserts that it is entitled to assert this latter affirmative defense under Faragher/Ellerth.

This defense is only available if the supervisor's behavior never "culminated in a tangible employment action against the employee." Petrosino, 385 F.3d at 225. Tangible employment actions include "hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." Ellerth, 542 U.S. at 765. As set forth above, a reasonable finder of fact could conclude that the November 2004 change in Vazquez's job responsibilities constituted an adverse action. However, since this action coincided with the alleged commencement of Ciprian's harassment, it is difficult to say that the harassment "culminated" in this action. Ciprian also issued a total of three memoranda, roughly one per month, admonishing Vazquez for poor job performance, but Vazquez has conceded or at least failed to contest the accuracy of Ciprian's critiques. Further, it is questionable whether a poor performance review could qualify as a "tangible employment action." See O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 388 (S.D.N.Y. 2001) (finding that a negative performance review could not constitute a tangible employment action for Faragher/Ellerth purposes).

To avail itself of the Faragher/Ellerth defense, Southside must show that "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. The court finds that Southside is entitled to invoke this defense in this case to bar Plaintiff's claims. Irrespective of whether a reasonable finder of fact could conclude that Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment," Mack, 326 F.3d at 122, Vazquez's claim fails because she has not presented evidence demonstrating that she attempted to mitigate the situation by availing herself of Southside's anti-harassment procedures. See McPherson v. NYP Holdings, Inc., 227 Fed. Appx. 51, 53 (2d Cir. June 27, 2007) (summary order).

In August of 2004, prior to the alleged incidents, Southside promulgated and distributed a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy"). (Pagan Aff. Ex. B.) The policy expressly prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage . . . age, disability or handicap . . . or any other legally protected status" and created a reporting mechanism that directed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law. (Id.) Cf. Faragher, 524 U.S. at 807 (defense unavailable where policy lacked "assurance that the harassing supervisors could be bypassed in registering complaints"). The collective bargaining agreement in effect between Plaintiff's union, Local 1102, and Southside also set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (regarding discrimination), Article 5 (grievance procedure).)

To the extent the alleged incidents were not reported to Southside, "there is no way a reasonable trier of fact could impute these incidents" to Southside. Smith, 319 Fed. Appx. at 57. Vazquez claims that she approached Pagan twice with complaints, but he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do." (Vazquez Dep. 88, 118.) When asked what problems she raised with Pagan to which she did not receive a satisfactory response, Vazquez testified: "The problems there are the supervisor, that she was always on my case. I don't know." (Id. at 88.) Vazquez's testimony suggests that she failed to address her claims of race, national origin, and age discrimination in her complaints to Pagan. She never put her complaints in writing. (Id.) Southside Administrator Pagan attests that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her." (Pagan Aff. ¶ 9.) Pagan acknowledges discussing conflicts between Ciprian and Vazquez, but has stated that "[t]he only

31

issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian." (Id.; see also Def. 56.1 Stmt. ¶¶ 39-40.)

Similarly, Vazquez testified that she notified A.J. Salgado, a representative of Local 1102, about her problems with Ciprian. (Id. at 115.) Salgado told her she had to respond to the memoranda issued by Ciprian. (Id.) Vazquez failed to act on Salgado's advice because she "got sick," "didn't want to bother," and "didn't go back to the office so [she] didn't answer the memorandum." (Id. at 116, 274.) It is unclear whether Vazquez specified that she suffered discrimination in these conversations; she testified only that "I told him about the way that she was treating me." (Id.) Vazquez also spoke to a Southside employee named Sonia Iglesias about the November Memo changing her job responsibilities, but she did not put forth any testimony or other evidence to show that her complaints to Iglesias raised the issue of discrimination on account of her race, national origin, or age. (Id. at 273.)

The court finds that through the creation and dissemination of the EEO Policy, coupled with the protections of the CBA, Southside exercised reasonable care to prevent and promptly correct any harassing behavior. In the absence of any evidence that Vazquez notified Pagan, Local 1102 leaders, or anyone else in a position of authority that she was suffering harassment on account of her race, national origin, or age, the court finds that Vazquez "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. Vazquez has failed to raise a genuine issue of fact that would allow a reasonable fact finder to conclude otherwise. Accordingly, her hostile work environment claim fails to withstand summary judgment.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted in its entirety.  The Clerk of Court is directed to close the case.


SO ORDERED.

Dated: Brooklyn, New York
     August 18, 2009

NICHOLAS G. GARAUFIS
United States District Judge